Good morning ladies and gentlemen. Our first case for this morning is Christopher Roberts against FHFA. Mr. Thompson. Good morning your honors and may it please the court, David Thompson for the plaintiff appellants. The network sweep is unlawful and must be enjoined for two independent reasons. First, the transaction violated Harrah's clear prohibition on Treasury increasing its ownership stake in the companies after 2009. And second, FHFA by imposing a mandatory zero capital regime violated its own statutory commands to preserve and conserve assets and restore them to soundness. Now with respect to Treasury, Harrah gave Treasury temporary authority to purchase the company's stock and that authority expired in 2009. Why did it purchase the stock? It changed the way it was going to get dividends. Well if we look at the economics of it your honor, it is no different than if they purchased every single outstanding share of common stock and junior preferred stock. In the sense of after the sweep they now get all the economic benefits that would have flowed to the junior preferred shareholders. Have you made a takings claim in the Court of Federal Claims? Yes your honor we have. Why isn't that the right remedy? Well your description of this is essentially that the value of the stock has been confiscated by a dividends rule passing all the money to the Treasury. Well if that's true that sounds like a takings claim. Why are we having this fight in the Seventh Circuit? Yes your honor, with respect our position is that under the APA that if the court finds that it was unlawful that it shall be set aside and in Levin versus Miller the court declined the government's invitation to interpret a statute to impose a massive takings liability on the United States government. And to answer the court's question about was this really a purchase or not, if we look at the government's own conduct your honor in this very case under 1719 G1B the government has to make certain findings whenever they do a purchase. And they did those findings in the First Amendment and in the other amendments even though in that instance too there wasn't a single additional share rather there was new economic value being created. And if we look at their revenue ruling and we cite this in our case it's revenue ruling 56-564 that revenue ruling involves the situation not unlike this where you have preferred stock and then it changes the liquidation preference of the preferred stock is increased to equal the entire net worth of the treasury department itself said that's an exchange, that's a new security. Well it's interesting you're talking about the liquidation preference because actually even the first and the second amendments had an effect on Treasury's liquidation preference. You know you're complaining that they were paying dividends and that they weren't using the other option which would go which would increase liquidation preference. But I don't see why if you think this is essentially a nationalization of Fannie and Freddie why the nationalization didn't happen sooner. Okay so a couple of points number one with respect to Treasury's authority it the First and Second Amendment were before the sunset. They raced to do the Second Amendment on December 24th 2009 because they understood that the authority was going away. So but they were but they were still talking about the dividends that they were going to get and what was Fannie and Freddie at that point didn't have enough money to pay it so they kept borrowing more and there was a big spiral of debt that was going on. Okay so I think we're talking about two separate things your honor because with respect to Treasury's authority which is what I had been focusing on there's a clear temporal divide. The court is asking about FHFA and its conduct and and this whole notion of a death spiral and with respect number one the complaint is insolvency and that because there was a payment in kind. Why is that the kind of fact that if alleged in the complaint the court has to accept? I realize you know that if if a complaint alleges you know that the light was green you have to assume the light was green but I don't understand why something along those lines is is simply to be accepted. Well and I understand the difference between adjudicative facts and legislative facts and the Moore versus Madigan case your honor but this is plainly an adjudicative fact. The question is whether these particular companies had sufficient earnings and ability to actually pay the dividends and whether in fact in the real world there was a problem with circular draws or whether it is a pretext as we maintain. We say it is a pretext for two reasons. Number one under the PSPAs there was an absolute right to elect to not pay the dividends and and so there was never a threat of insolvency. But increasing the liquidation preference certainly in the end is a claim on the assets. But it wouldn't it their their argument about the death spiral and and and draw and the circular draws is that it imperiled the line of commitment. Their argument is we were doing these billion dollars worth of them and that was a big problem because it imperiled the line of commitment. So where are you getting the 26 from? I remember that that there was first a cap of a hundred billion and then it got popped up to 200 billion and then it got then the cap was taken off altogether and I guess what one of the fundamental problem I certainly share Judge Easterbrook's opening question if this is really just nationalizing Fannie and Freddie and you haven't been and your clients haven't been compensated there's a forum for those kinds of claims but putting that to one side I was overwhelmed reading these briefs with the sense that you are taking an ex post viewpoint on this and at the time all of these arrangements were made it was not at all clear whether this the dividend that was due was going to be payable what you call the net worth sweep turned out to be favorable in some years not favorable in other years nobody knew people were making arrangements. Your Honor with respect our complaint is replete with sworn deposition testimony with internal emails from the government showing that they in fact knew they did a renewed push on August 8th of 2012 the CFO of Fannie Mae went in to meet with senior Treasury officials and they asked you know that deferred tax asset are you testified that she told them yes we are they said when she said 2013 in all likelihood they said how much money will that be she said about 50 billion dollars that's ex-ante and we have an email from that morning where the participants in that meeting said let's have a renewed push to get this done so that's ex-ante it's also ex-ante the fact that they could just do a payment in kind and increase the liquidation preference the court asked where do I get the 26 billion dollars from what I'm talking about there is the amount of circular draws the court is correct that the line of commitment started at a hundred billion and then went up to 200 billion but when they invoked the line of commitment where else are similar claims pending the DC circuits decided one such claim where else are they being litigated I believe there are cases in the Fifth Circuit the Sixth Circuit and the Eighth Circuit the Sixth Circuit has had and the Eighth have not. And when was the oral argument in the Sixth Circuit? Approximately July 29th. Okay thank you. So what I what I was thinking about just to pursue this point for a minute I'm looking at the Treasury's brief for the Third Amendment they note that by exchanging a fixed dividend for a variable one they accept more risk and so there's some years of course 2013 and 2014 where they get more than they thought but they say they received less in dividends in 2015 and 2016 than they would have under the original 10% number so that it's numbers like that that made me think you know okay well if you're gonna focus only on the years in which it was in one direction that's doesn't seem right to me. Well your honor two things on a net basis if you look at the totality of all the years it's a hundred and thirty billion dollars but the other point and this is crucial because it's different your honor every year is the same in this respect it was impossible for them to make less money under the Third Amendment impossible because in the regime prior to and let me explain why if I may in in in the regime prior under the Second Amendment let's say the company's made five billion dollars in profits Treasury would take all of the five billion it's true. Can I ask you about what's a profit by the way it seems to me it's at the end of each quarter correct that these that the net that what you call the net worth sweeps happen. Yes your honor. Okay so during the course of that quarter Fannie and Freddie are operating I assume as businesses they're paying money out they're getting money in they're operating ordinarily correct? Yes your honor. All right so why couldn't during the preference for example. Oh they're not permitted to under the PSPAs without Treasury's authority that's why we call this a concrete life preserver this you know so-called bailout is unlike any other that I've ever seen in that the companies are. What provision of the PSPA prohibits that? Your honor I can get you that particular side on rebuttal but they are not I believe all the parties agree that they are not allowed to pay down the liquidation preference without the approval of Treasury and going back to this idea of well the Treasury accepted some risk what they say that's not true and I want to just follow through on that logic so if in under the second amendment let's say in 2011 the company's made five billion dollars Treasury would take all of that five billion dollars. No I understand. It's true there would be a circular draw and on a net basis you know they pay themselves some dividends and borrow but on the net basis they get five billion dollars. Now under the Third Amendment if the companies make five billion dollars they still get it. The difference the only economic difference is that under the Third Amendment if the companies make more than 19 billion they get to keep it and we have their internal documents which we cite in the complaint where they were celebrating this and talking about this. That makes motive the driving force and I'm not sure motive makes any difference. We have the question here as I see it looking for example at the section 4617 F we have the question whether Treasury has acted in an ultra virus manner whether it has in fact operated under the powers it's given either as conservator or receiver or whether it's outside those powers. Otherwise there's no jurisdiction for us to do anything or no I don't want to say jurisdiction there's no the statute doesn't create a claim. So your honor Judge Brown on the DC Circuit agreed. Who was the dissenting judge right? No but she agreed with with the point that motive is irrelevant and she still found that FHFA. You were just making a motive argument so if we could delete that and motive makes no difference I'd be perfectly happy. We agreed that if the court only looks at effect we win and the reason is because the effect of what they have done is imposed a mandatory zero capital regime. Director Watt himself has testified that it is especially irresponsible to run these two huge financial institutions with zero capital soundness. But what about the zero that's why I asked about actual operations if if this operates on the net amount of money at the end of each quarter after these organizations have conducted their business in the ordinary course of business why does it hurt them to have what why does it impede their ability to do business if the amount of money at the end of the quarter is greater or lesser? Director business needs to have capital to for the vicissitudes of the business cycle that you you have that and that's why throughout financial institutions. How were Fannie and Freddie hurt by this system other than by not paying dividends to your clients which which is not an injury to them it's an injury to your clients. They were hurt by having zero capital it is mandated. You're saying that but I don't understand why. I'm not saying it Congress is saying it Congress says soundness it has to be operated in a sound manner and 4513 of this statute makes clear that soundness means having capital and we see that not the Treasury is standing behind them. So then so if the argument is that the line of commitment is the capital number one Director Watt has said it's not operating capital number two the PSPAs do not treat that line of commitment as number three the net worth sweep exposes that line of commitment to maximum vulnerability. In the absence of the sweep there would be a hundred and thirty billion dollars of capital standing between losses and having to draw on the line of commitment. Now because all of that profit is off the balance sheet and they're operating in a zero capital world the first dollar of loss comes out of the line of commitment. In the absence of the sweep there'd be a billion dollars on the balance sheet to absorb those losses and and so when Congress said that the FHFA has to operate it in a sound and solvent manner it was referencing capital. We see that in the regulations we see that in HERA itself 4513 says soundness means maintaining proper capital. With respect I'd like to go back to this argument. Maybe you could talk for a minute about whether or not your clients have a right to bring this as a direct action. Well Your Honor first of all we under the APA. Because it seems it sounds to me from everything you've said so far is that you are making an argument that Fannie and Freddie have been hurt not your clients. Both have been hurt Your Honor. We have been. Only derivatively though. No okay Fannie and Freddie were hurt because they don't have capital. We were hurt because all of the economic value associated with our shares were taken away and it doesn't affect all shareholders equally. One shareholder the United States Treasury is benefiting and was able to take all of these shares away and under the APA it's it's a lenient standard and and zone of interest has been met. I see my time is on I'd like to save my time for rebuttal if I may. That would be fine. Thank you. Mr. Cain. May it please the Court. Your Honor actually it's Jerry Sinsdag appearing on behalf of the Treasury Department. I'm sorry. I'm sharing time with Mr. Cain. Your Honor two separate and independent provisions of HERA bar plaintiffs claims. First HERA's anti-injunction provision 4617 F which prohibits a court from taking any action that would restrain or affect FHFA's powers as conservator applies here. The Third Amendment was a quintessential as the DC Circuit put it a quintessential conservator task. It involved the renegotiations of dividends with the GSE's most significant and vital investor the Treasury Department and and for that reason 4617 F applies. So isn't this one of those situations though where in order to decide whether we can decide as I said I think probably more whether this states a claim but to the extent it matters. We do need to see whether what Treasury did was within the scope of the powers or functions that it has under the statute as conservator. It's not a receiver in this instance right it's a conservator. It's a conservator. So through the back door that comes pretty close to having to decide the whole merits of the case just to decide whether we can decide the case right. Your Honor the question whether it acted beyond the scope of its conservator powers right effectively that's the whole same as an APA claim. And so your opponents argue how can you say it's conserving these two companies to have their full net worth be the amount of the dividends that are owed as opposed to some other number some other system. Yes thank you your Honor and I think there's a point that's very important that your Honor has already alluded to and I want to make this clear up front between 2008 and 2012 Treasury committed four hundred and forty five billion dollars to the GSE's. That is to cover any time their net worth falls below zero thus ensuring they never become insolvent. The GSE's have drawn 190 billion dollars from that commitment roughly between 2008 and 2012 but that has left 258 billion dollars in taxpayer funds that are there and available to the GSE's anytime that their net worth falls below zero. And that commitment is absolutely vital to the GSE's. It is that commitment that has kept them in business for the last five and a half years since the Third Amendment. It is that commitment that they will remain in business. It is that commitment that has you know that assures that they will be around for the foreseeable future. So let me put it this way your opponent has at a minimum suggested an alternative way that the markets could have had confidence post 2012 and that's by letting them keep their own or decide. I'm not sure they would have kept every penny they maybe they would have paid something out in dividends to all of their stockholders but you know he was throwing around you know 126 billion dollars is a number another number called 100 billion if you want. That would be another way to have confidence in the companies and I guess the question is that are you forced to do it that way? Are you allowed to do it with putting the credit of the United States behind them? Well precisely your honor. I mean it's you know fundamentally at root plaintiffs claims are this could have been done a different way but that goes to the business judgment of FHFA. Surely it's up to FHFA to decide whether it would prefer to build up internal capital or rely on Treasury's capital to keep the businesses ongoing. That is fundamentally a business judgment and of course plaintiffs disagree strongly with it and they think it could have been done a different way as your honor points out but that is fundamentally a business decision by FHFA as conservator in the position of how to ensure that these systemically important entities remain in operation for the foreseeable future and that is protected by 4617 F. That is precisely the type of business judgment that is protected by the anti-injunction provision. Now when you mention business judgment it makes me think of the business judgment rule and things like that. Are we dealing here in a realm entirely of federal law or does I realize that the companies for internal affairs have chosen the laws in their bylaws of various of Delaware and Virginia right? That's correct but it is you know at root HERA is of course a obviously as we pointed out in our brief particularly with respect to the direct derivative claim issue federal law often looks to state law on those issues but I think at least on those issues the state and federal law is in accord with what qualifies as a direct claim versus a derivative claim and as your honor suggested earlier these are quintessentially derivative claims. They allege a harm to the company and they seek a relief the unwinding of the Third Amendment that would flow to the companies not directly to the so alternatively barred by the transfer of shareholder rights provision. Is there anything you that, can you give me an example of something that would have been beyond the power of FHFA to take that would not be immune under 4614 F? Sure your honor. I think one example that has arisen in other litigation is the suggestion that the conservator is regulating the entities. FHFA also serves as a regulator and is subject to in most cases with some exceptions APA review of their actions as a regulator so in cases like Leon County and Sonoma County that was from the Ninth Circuit and the Eleventh Circuit there was the allegation that you're acting as a regulator you can't do that and the courts rejected that argument but that would be an example of where of where that takes us to the FDIC analogies doesn't it? Yes and we believe the case law is analogous under FREA. Okay and I guess the last question is maybe a version of the first question. If in fact the Treasury has made itself the owner of every last penny of net worth what why wasn't this a purchase of the stock at a time after that power had expired? Yes your honor and with respect just for one second of course argument is that 4617 F bars even that claim against Treasury because an injunction would restrain FHFA as directly as it would so but to answer your honor's question it's not a purchase primarily because Treasury invested no new taxpayer dollars and acquired no new shares and I think it is on that front important again to remember the purpose or the first place that was to allow Treasury to provide taxpayer dollars to prop up the GSEs in 2008 when they were when they were in a precarious financial situation and then obviously Congress I think as the surrounding provisions indicate was concerned about protecting taxpayer dollars and ensuring so it placed a temporal limit on how long Treasury could do that and here we have an example where Treasury you know did not commit any additional funds and this was simply a contract amendment and a modification to the underlying fixed dividend obligation to change it to a variable one and that's that's all we have here your honor. Okay. If your honors have no further questions. Fine, thank you. All right now it's your turn Mr. Cain, sorry. May it please the court, Howard Cain for Federal Housing Finance Agency. Judge Easterbrook asked a question which I plaintiffs are not happy with the original contract from 2008. They don't like the structure that was set up then. They don't like the fact that pursuant to authority granted to Treasury expressly in the 2008 HERA legislation and I note that that authority is included in the statutory charters of legislation, the director in 2008 set up a new paradigm and it determined that it would not evaluate capital the way capital is typically evaluated, the capital in the bank. Instead, as has been indicated, the director looked at how large is the Treasury commitment. Is that a large enough to satisfy the purposes of capital? Is it large enough to keep the markets happy? And over time that was increased but the important point was from day one in 2008, way behind the statute of limitations your honors, as I've pointed out in both briefs, from day one it was not set up that the conservatorship, that capital would be maintained at some type of regulatory minimum and it was set up that way because the purpose of the commitment was to assure that at no time were the institutions, would FHFA be required to place them into those. These aren't just plain vanilla national banks or state chartered banks. These are financial institutions but Congress chartered them as part of a greater purpose. That greater purpose was to facilitate, to enable, to enhance the operation of the national mortgage markets and that was the key purpose of these enterprises. So when Treasury made this massive investment, and I emphasize, it's only by the grace of the continuation of this massive investment today, over a quarter of a trillion dollars, that these enterprises remain operational. The relief sought by plaintiffs would set aside, just wreck, wreak havoc on this, I would say magnificent oversight effort to assure the operation of these very poorly of bankruptcy judges. Lots of businesses that go underwater continue in operation. If they have value in their future operations, they are recapitalized and continue. Your assertions just deny that that process exists. I don't think you need to make assertions like that in order to prevail in this case, but if your argument depends on them, you've got a lot of money in finance. Again, you. Your Honor, I respect that. I don't disagree with the court's comments. My point was only, and if I overstated it, apologies, my point only was the... Your point was that when a business fails, only nationalization will save it, and that isn't true. The statute... You don't want to rest on this that there is particular legislation that Congress passed in this particular area to use, to create a different solution that Congress, for reasons best known to itself, didn't want, at least in 2008, the bankruptcy process to unfold. It could change its mind at any time, I presume, and I, as I, one of the things that I pondered looking at all of this was, is it entirely up to Treasury or FHFA or somebody else to put an end to this system in which we have the net worth at the end of each quarter being paid over to Treasury? I mean, are we just doing this forever, or is this a temporary expedient? In the pertinent provisions of the agreement, Your Honor, as amended, it provides that, for example, the periodic commitment fee will be relinquished, will not be required for so long as the new dividend structure remains in place. So it, in that language, I believe it contemplates the possibility of further amendments tomorrow or down the road, but... That might restore this to some semblance of a market kind of operation? Your Honor, restore it to market operation, a decision could be made to place it in receivership. Congress might take action that would get implemented by the structure, but the conservatorship itself is, by definition, temporary but indefinite. I could not... That sounds very much like a government agency. A temporary but indefinite structure, and I guess... Which for a government agency lasts a hundred years. How much longer? Temporarily. Temporarily, yeah, that's right. And then everything is temporary. The Interstate Commerce Commission lasted a hundred. As they said in one of my favorite movies. The Interstate Commerce Commission did last a hundred before it was replaced by another identical agency with a different name. Surface Transportation Board. Yeah. Right. So, yes, so we have this temporary, permanent, or permanent-temporary situation, and all I was going to do was ask what you think the term conservatorship means. Your opponents have said that that means you've got to sort of give the companies the best boost possible. In what sense do you think you're running a conservatorship? Well, the reference to solvency, I believe, Your Honor, means that it stays technically solvent over zero, so that it not be placed into receivership under the mandatory statute. Under the particular statute that governs this area. Yes, but beyond that, I believe conservatorship in the enable the operation of these enterprises until such time as a receivership is imposed, or until the conservatorship ends. For the temporary period of the conservatorship, the whole point of being the purpose of existence for the conservator is to facilitate, to enable these enterprises to operate, now in this case, support, they would be unable to operate at all. So they've been conserved in the sense that they're put in a position to continue doing business in the market of the sort that Congress wants them to do, to keep the national mortgage markets liquid and operating. I would agree with that precise statement, Your Honor, and I can't, oh. No, you're not out yet. I would also highlight that a lot of the courts back and forth with plaintiff counsel and talking about motive and purpose, at the end of the day, this decision, this case is, I believe, effectively controlled by Your Honor's decision, and Judge Barrow was on the panel in Courtney v. Halloran, which dealt with the FDIC analog to statute here, the lower court, in this case, relied heavily on that decision. And that makes it clear that motive, purpose, intent, none of that is relevant. The only issue for the lower court, and I respectfully submit this court is, did the FHFA exercise a power authorized by Congress in this case? It did. It was operating the institutions, it was conducting the business of the enterprises, that's how- The take over the assets of and operate the regulated entity with all the powers, etc., right? That's what you're relying on? Right, and as long as the FHFA is exercising a power granted by Congress, which it was, we submit that that is the end of the inquiry. That's what this court found in the FDIC analog, and that same analysis applies precisely here. You said that takes us over into 4617F. Yes, the statute the court relied on in the Halloran case was 1821J. It was an analogous statute. Yes, worded actually, the actual words except for FDIC and FHFA were precisely identical, Your Honor. If there are no further questions? I see none, so thank you very much. Mr. Thompson, I'm sure you have something further, so we're glad to hear from you. Thank you, Your Honor. So just quickly on Treasury made the point during its presentation that 4617F bars any injunction against Treasury, even though of course it only talks about FHFA. With all respect to Treasury, we would say that is both wrong and irrelevant. It's wrong because Congress was very clear that it wanted the courts to enjoin violations of HERA. Even FHFA, which is the beneficiary of the anti-injunction provision, admits that it can be enjoined if it violates HERA. So there's no reason to think that Treasury would somehow be in a better position, even though they didn't get an anti-injunction provision. But none of them think they violated HERA, of course, because the general powers of the agency as conservator or receiver, 4617B, are quite broad. But, Your Honor, their position is that tomorrow they could walk, Treasury could walk into FHFA and say we'd like to buy a thousand shares of FAME. That would be a new case. But that's their position. That is their position. And, Your Honor, Judge Chang cut right through that and said it's irrelevant because he said what is alleged here is that Treasury and FHFA entered into an agreement to violate HERA by purchasing shares out of time. That's our position. But when the agency as conservator takes over the assets, collects money, performs functions, and talks to its counterparty, you seem to think agreement makes it bad. No, an agreement to purchase out of time is what makes it bad. That's not what we have here. Well, under their revenue ruling, 56-564, the Treasury Department tells taxpayers in a transaction just like this one, that's a sale, that's an exchange. But you had that whole section of your brief with quite a few analogies, but this statute needs to be read for itself, right? Well, I don't think they have not pointed... I'm not sure that revenue rulings are the best evidence here. And their regulations and securities law. They have not pointed to any body of law which exalts form over substance like this. And here's the point I was trying to make, Your Honor, which is under HERA, when there is a purchase, certain determinations need to be made. This is under 1719 G1B. They have to, if there's a purchase, Treasury needs to make a purchase. And earlier, there were no shares that were added and they made that determination. We see that on page 89 of the appendix. And so Treasury's own conduct here conforms to economic reality up until the time of the sweep. They recognize... And how could they operate as a conservator? In your view, anything they do as a conservator makes them de facto a purchaser, which I think is inconsistent with the language of the statute. Any time Treasury, after December 31, 2009, increases its equity ownership stake... But it didn't do that. What it did was it took all the benefit from the shares. I mean, supposing it just said, you know, you used to owe us, you know, a certain amount of money each quarter. Now we're going to double it. Would that be subject to your same arguments? That might be problematic. We'd have to look at the effect of it, but it would be different from FHFA's perspective in one key respect, is it would not be a zero capital regime. It would be a problem for Treasury. Treasury's increasing its economic stake in the companies. Congress was very clear that they wanted a temporal limit on the ability of the United States government to buy more equity, to increase their equity stake in these companies. No, you've made that point repeatedly, and I guess the whole question is, is that a fair characterization, or in fact, is the alternative characterization that they're offering a better match for the various powers they have as conservator? As conservators, they can carry on the business. They can do all sorts of things. I don't know that that has anything to do with how many shares they have. So FHFA has authority to carry on the business. Treasury doesn't have any authority to carry on the business. The Treasury has underwritten the business. Yes, and they could do that underwriting up until they could increase their equity stake up until the sunset, if I may, in my remaining moment. So the FHFA said solvency. They said nothing about soundness on solvency. They told the Southern District of Florida the companies are technically, are effectively insolvent, and they should be held to making that statement. Judge Brown, in her dissent, quotes it. All right, thank you very much. Thanks to all counsel. Case under advisement.